[Civil No. 3555. Filed October 4, 1934.]

[36 Pac. (2d) 549.]

JAMES H. KERBY, as Secretary of State of the State of Arizona; MELVIN C. GREER, as Clerk of the Board of Supervisors of Apache County in Said State; W. E. CLARK, as Clerk of the Board of Supervisors of Cochise County in Said State; GEORGE A. FLEMING, as Clerk of the Board of Supervisors of Coconino County in Said State; V. C. MURPHY, as Clerk of the Board of Supervisors of Gila County, in Said State; W. L. BUFFINGTON, as Clerk of the Board of Supervisors of Graham County, in Said State; ANNE S. TERRY, as Clerk of the Board of Supervisors of Greenlee County, in Said State; ORRIS HOLDREN, as Clerk of the Board of Supervisors of Maricopa County, in Said State; H. D. PATTILLO, as Clerk of the Board of Supervisors of Mohave County, in Said State;

W. J. HOCKWAY, as Clerk of the Board of Supervisors of Navajo County, in Said State; GLADSTONE MacKENZIE, as Clerk of the Board of Supervisors of Pima County, in Said State; C. H. NIEMEYER, as Clerk of the Board of Supervisors of Pinal County, in Said State; WILLIAM G. SIMONTON, as Clerk of the Board of Supervisors of Santa Cruz County, in Said State; KENNETH AITKEN, as Clerk of the Board of Supervisors of Yavapai County, in Said State; WILLIAM B. LINDER, as Clerk of the Board of Supervisors of Yuma County, in Said State; Appellants, v. ARTHUR LUHRS, Appellee.

210

Mr. Arthur T. La Prade, Attorney General, Mr. Charles L. Strouss, Assistant Attorney General, (Mr. W. C. Fields and Mr. A. R. Lynch, of Counsel), for Appellants.

Mr. Lynn M. Laney and Mr. Grant Laney, for Appellee.

LOCKWOOD, J.—This is an action by Arthur Luhrs against James H. Kerby, as Secretary of State of the state of Arizona, and the clerks of the various boards of supervisors of the state, to enjoin Kerby from certifying to the boards of supervisors, as entitled to be placed on the ballot at the election to be held November 6th, a certain proposed constitutional amendment, and to enjoin the clerks from placing such amendment on the ballots. The superior court issued the injunction, and the correctness of its order is before us on this appeal. Because of the importance to the people of the state of the

questions involved herein, we have advanced its hearing in every possible manner. There is no dispute as to the facts involved, and the question presented is solely one of law.

The amendment was an initiated one, and no question is raised as to the sufficiency of the signatures, or of the legality of the form of the petitions, but it is contended that it violates an existing provision of the Constitution which regulates how such amendments should be submitted. A proper understanding of the question ·can only be had by examining the entire text of the proposed amendment in the light of the constitutional provision which, it is claimed, its submission in its present form violates. The proposed amendment reads as follows:

"Be it enacted by the people of the state of Arizona:

"That Article IX of the Constitution of the State of Arizona be amended by adding thereto three additional sections, numbered Section 12, Section 13, and Section 14, to read as follows:

" 'Section 12. Every person engaged in the mining of copper within the State of Arizona, as owner, lessee, trustee, possessor, receiver, or in any other proprietary capacity shall, in addition to all other taxes or excises imposed by law, pay to the State Treasurer, for the use of the State of Arizona, a license tax as follows:

" 'A tax of one-half cent per pound on all copper produced from ore mined or extracted by open pit or surface operation;

" 'A tax of one-half cent per pound on all copper produced from ore mined or extracted by underground operation where the average grade or copper content of such ore exceeds two percentum, and one-quarter cent per pound where the average grade or copper content of such ore shall equal two percentum or less.

" 'Every person taxable under the foregoing provisions shall quarterly, on the first of January, April,

July, and October of each year, make a return to the State Tax Commission, on forms prepared by the Commission, showing the total tonnage of ore mined or produced for the preceding quarter, the average grade of copper content of such ore, the number of pounds of copper produced, and such other information as shall be required by the Commission, and shall on said dates pay to the State Treasurer the tax for the preceding quarter.'

'' 'Section 13: The tangible property of public service corporations engaged in the production, sale, or distribution of gas, water, or electricity, shall unless exempted from taxation by law,.be assessed for purposes of taxation upon the valuations fixed by the Corporation Commission of Arizona for rate-making purposes.

'' 'The Corporation Commission shall on or before May 1st of each year, transmit to the State Tax Commission a statement of the tangible property of each such public service corporation operating within the State, and the valuation of such property fixed by the Corporation Commission for rate-making purposes.'

'' 'Section 14: The State Tax Commission of Arizona, as it now exists, and is heretofore created by Chapter 23, Laws of the First Legislature of Arizona, Regular Session, is hereby created and declared a constitutional commission and office.'

''Such Commission shall have charge of the administration of Sections 12 and 13 of this Article, with full power to prescribe and promulgate rules, regulations, forms and penalties for its enforcement.

''Any license tax imposed by Section 12 shall become delinquent on the fifth day after it shall become due and shall bear interest at the rate of ten per cent per annum after delinquency; it shall be a lien upon all property in this State owned by the taxpayer upon whom it is imposed.

''The Commission, its attorneys, auditors and agents, shall at all times have access to the books, records, and returns of any taxpayer under Section 12 of this Article, relating to the mining or production of copper and copper ores, and shall have full power

to compel obedience to the provisions of this Section, by attachment or other process.

"The Commission shall have power to appoint and pay auditors, accountants, agents and attorneys necessary to the enforcement and collection of the license taxes imposed by Section 12 hereof, and to the carrying out of any other constitutional or statutory duty imposed upon it, and may bring and defend actions at law or in equity requisite to the proper discharge of its duties.

"The license taxes and interest collected under Section 12 of this Article shall be used in defraying deficiencies and outstanding obligations of the state until the same have been paid; therefore they shall be deposited to the credit of the general fund of the State for the uses of such fund.

"The term 'person,' as used in. Sections 12, 13 and 14 of Article IX, shall mean and include any individual, firm, copartnership, company, corporation, association, joint stock company, common law trust, business trust, syndicate, or other concern of whatsoever name, or however organized, found or created.

"Sections 12, 13 and 14 of Article IX are declared to be self-executing, and are intended to be carried out by the State Tax Commission, without legislative intervention which Commission is empowered to impose and promulgate all necessary rules and regulations in the premises, which rules and regulations imposed shall have the effect of law."

And the constitutional provision which it is claimed it violates is in the following language: Article 21, section 1:

" . . . If more than one proposed amendment shall be submitted at any election, such proposed amendments shall be submitted in such manner that the electors may vote for or against such proposed amendments separately."

It is contended that the proposed amendment is contrary to the provision quoted, in that, although in name but one amendment, it is in substance actually three or more.

It is a cardinal axiom of interpretation of all written instruments that they are to be construed in the light of their purpose, and this is particularly applicable to Constitutions, which are by necessity general in their nature, and presumably intended to remain in force for a long period of time. It is therefore held that they are to be construed in the light of the exigencies and conditions which they are intended to meet and deal with. *McCulloch* v. *Maryland*, 4 Wheat. 316, 4 L. Ed. 579; *Home Building & Loan Assn.* v. *Blaisdell*, (Oct. Term, 1933) 290 U. S. 398, 54 Sup. Ct. 231, 78 L. Ed. 413, 88 A. L. R. 1481. It was agreed by counsel for both plaintiff and defendant at the oral hearing of this case that there is no doubt the constitutional provision above quoted was intended to prevent the pernicious practice of "log-rolling" in the submission of a constitutional amendment. This so-called log-rolling may be illustrated as follows: Three interested parties are desirous respectively of securing the enactment into law of three distinct propositions, A, B and C. These propositions are so essentially dissimilar that it is obvious that the legislators, who must pass thereon, will probably be divided in their opinion as to their merit. Some of them may earnestly desire proposition A, while being opposed, though in a lesser degree, to B and C. Others consider the enactment of proposition B of paramount importance, while objecting to A and C, while the members of a third group are willing to sacrifice their convictions on A and B for the sake of securing C. The original framers of the three propositions, realizing this situation, place them all in one measure, so that a legislator must vote either yes or no on the measure as a whole. He is thus forced, in order to secure the enactment of the proposition which he considers

the most important, to vote for others of which he disapproves. Such practices have been universally condemned by impartial students of public affairs, and yet they are notoriously prevalent in all legislatures. Indeed, so true is this, that our Constitution permits the Governor to veto separate items of an appropriation bill, without rejecting the whole bill. Article 5, section 7, Constitution of Arizona. But, if these actions are evil in the legislature, where they deal only with statutes, much more are they vicious when constitutional changes, far-reaching in their effect, are to be submitted to the voters. The principle involved is well summed up in the dissenting opinion of Justice GRAVES in *State ex rel.* v. *Gordon,* 223 Mo. 1, 122 S. W. 1008, 1018. While in that case Justice GRAVES was in the minority, in the later case of *State* v. *Gordon,* 268 Mo. 321, 188 S. W. 88, the majority opinion in the case first cited was expressly overruled and the reasoning of Justice GRAVES adopted. He said:

" . . . Propositions relative to the taxing power of the state, and propositions to be voted upon by the plain people, must be plainly stated, and in single and substantial form. Not only so, but they must be so stated as to avoid what has been denominated by the courts as 'logrolling' in the interest of a combined proposition, which would not occur in the interest of a single proposition. The courts in the administration of justice, and without any reference to constitutional mandates, have discovered that doubleness of propositions to be voted upon by the public was inducive of fraud, and that it was uncertain whether either of two or more propositions could have been carried by vote had they been submitted singly. To obviate this fraud upon the taxing power of the state this court, up to the present time, and excepting the present case, has consistently turned its face against doubleness of propositions and the frauds which are the necessary outgrowth thereof.

"However, before going to the holding of the courts of this state, it might be well to submit the general proposition of law resulting from the examination of all cases bearing upon the question. In 21 American and English Encyclopedia of Law (2d Ed.) 47, it is said: 'Two propositions cannot be united in the submission so as to have one expression of the vote answer both propositions, as voters might be thereby induced to vote for both propositions who would not have done so if the questions had been submitted singly.'

"This announcement of the general doctrine is not only in full accord with the cases in Missouri, but with all of the jurisdictions to which our attention has been called. And if we be called upon to assign a reason for this salutary rule, that reason would be that the taxing power of the state should be exercised with the utmost openness and fairness, and without opportunity for 'jockeying' and 'logrolling.' In other words, the courts of the country generally, in matters which go to the exercise of the taxing power of the state, have been exceedingly cautious to see that such power was exercised by a fair expression at the election held for such purpose. The question is not whether a constitutional mandate has been followed, but whether the proposition submitted is one which tended within itself and upon its face to induce 'jockeying' and 'logrolling' in order to carry a combined proposition. That such things may be done is apparent to all thinking minds. . . . "

There is and can be no disagreement as to the evil the constitutional provision was intended to prevent, and many states, recognizing that evil, have adopted provisions in their Constitution like ours in order to prevent it. The difficult question, however, is to determine what test shall be used to ascertain whether there are in reality several amendments submitted under the guise of one.

We have carefully examined all the cases cited by both counsel for the plaintiff and for the defendant. Apparently the first in point of time which lays down

such a test is *State* v. *Timme,* 54 Wis. 318, 11 N. W. 785, 790. Therein the court said:

" . . . The learned counsel admits that the proposition to change from annual to biennial sessions is so intimately connected with the proposition to change the tenure of office of members of the assembly from one year to two years, that the propriety of the two changes taking place, or that neither should take place, is so apparent that to provide otherwise would be absurd. And yet it is insisted that the two changes are two separate amendments within the meaning of the constitutional provision above quoted, and must be submitted separately. If they must be submitted separately, why must they? *Certainly they should either both be defeated or both adopted.* Why, then, should the people be permitted or compelled to vote upon each separately? Certainly no good could result from a separate submission which is not equally as well and better accomplished by submitting them together as one amendment; and the separate submission might result in the absurdity of the ratification of the one and the rejection of the other. This illustration is, to my mind, almost conclusive that no such intention was entertained either by the framers of the constitution or by the people who adopted it.

"We think amendments to the constitution, which the section above quoted requires shall be submitted separately, must be construed to mean amendments which have different objects and purposes in view. In order to constitute more than one amendment, the propositions submitted must relate to more than one subject, and have at least two distinct and separate purposes not dependent upon or connected with each other. . . . " (Italics ours.)

This general rule has been quoted approvingly innumerable times. We mention only a few of the cases which cite it: *State* v. *Cooney,* 70 Mont. 355, 225 Pac. 1007; *State* v. *Wetz,* 40 N. D. 299, 168 N. W. 835, 5 A. L. R. 731; *Jones* v. *McClaughry,* 169 Iowa 281, 151 N. W. 210; *Gottstein* v. *Lister,* 88 Wash. 462,

153 Pac. 595, Ann. Cas. 1917D 1008; *State* v. *Alderson,* 49 Mont. 387, 142 Pac. 210, Ann. Cas. 1916B 39; *State* v. *Jones,* 106 Miss. 522, 64 So. 241; *People* v. *Prevost,* 55 Colo. 199, 134 Pac. 129, 133; *Hammond* v. *Clark,* 136 Ga. 313, 71 S. E. 479, 38 L. R. A. (N. S.) 77; *Lobaugh* v. *Cook,* 127 Iowa 181, 102 N. W. 1121, 1123; *People* v. *Sours,* 31 Colo. 369, 74 Pac. 167, 102 Am. St. Rep. 34; *Gabbert* v. *Chicago, R. I. & P. Ry. Co.,* 171 Mo. 84, 70 S. W. 891; *State* v. *Herried,* 10 S. D. 109, 72 N. W. 93; *Winget* v. *Holm,* 187 Minn. 78, 244 N. W. 331, 335; *McBee* v. *Brady,* 15 Idaho 761, 100 Pac. 97; *State* v. *Powell,* 77 Miss. 543, 27 So. 927, 931, 48 L. R. A. 652; *Mathews* v. *Turner,* 212 Iowa 424, 236 N. W. 412, 415. Many of them merely quote the language of *State* v. *Timme, supra,* or refer to it approvingly, but there are a number which go into the question more fully and elucidate and explain what is meant by propositions which "relate to more than one subject and have at least two distinct and separate purposes not dependent upon or connected with each other."

In the case of *Mathews* v. *Turner, supra,* the court says:

"It is argued that if the proposed amendment has 'but one object or purpose' it is valid, even though it may contain many different propositions, if they are related to said 'one object or purpose.' Such, however, is not the provision of section 2, article 10. It provides that if two or more amendments are submitted at the same election they shall be submitted separately, and this is true even though they may pertain to the same general object or purpose. *An entire Code of laws cannot be embodied in an amendment to the Constitution merely because said laws pertain to 'one object or purpose.'*

"By way of illustration, education of the youth of the state is 'one object or purpose.' A constitutional amendment would not be valid, however, which would

declare that a schoolhouse shall be erected at every two miles upon certain described highways throughout the state, that schools shall be maintained a certain number of months of the year, that certain salaries shall be paid, that certain text-books shall be used, that directors shall operate the schools, that the cost of the buildings shall not exceed a named sum, and shall be paid from funds derived from taxation, from federal aid, and from fines. Could a court uphold such an amendment on the ground that it had 'one object and purpose,' namely, the education of the youth of Iowa? Under such a proposed amendment a voter might favor any one or more of the propositions embraced in the 'one object or purpose' of education and be opposed to others. It was to obviate just such a situation that section 2 of article 10 was adopted." (Italics ours.)

In *Winget* v. *Holm, supra,* the main opinion, written by one member of the court, was concurred in specially by the two remaining members who said that they agreed with the result, but that they felt "that we should make it plain that a multifarious proposition to amend the Constitution will not be sustained simply because, although there are several distinct 'alterations or amendments,' they will yet be held a unit solely because all, if adopted, will operate within one of the three great fields of governmental power—those of taxation, eminent domain, or police."

In *State* v. *Powell, supra,* it was said:

" . . . Whether amendments are one or many must be solved by their inherent nature,—by the consideration whether they are separate and independent each of the other, so as that each can stand alone without the other, leaving the constitutional scheme symmetrical, harmonious, and independent on that subject, and not upon the mere blanketing of a name, such as 'amendments relating to the judicial department,' or 'amendments relating to the executive department' or to 'the legislative department.' "

And while in a later case the court reached a different conclusion on practically the same facts as to whether there was more than one amendment, yet the test applied was never changed.

In *People* v. *Prevost, supra,* the following language was used:

" . . . In the Sours Case, it was determined that the Constitution does not require the submission of separate subjects, but only that each amendment be separately submitted, and that it is one amendment if the subjects are germane to the general subject of the amendment, or so connected with or dependent upon the general subject *that one is not desirable without the other,* even though other articles be incidentally affected or constructively amended, or amended by implication. . . ." (Italics ours.)

While in *Lobaugh* v. *Cook, supra,* the court, after considering the Timme case, held:

" . . . If the amendment has but one object and purpose, and all else included therein is incidental thereto, and reasonably necessary to effect the object and purpose contemplated, it is not inimical to the charge of containing more than one amendment. We do not understand counsel for appellant to question the rule as stated; save in insisting that the mending of the broken places in other parts of the Constitution shall be limited within the narrowest bounds of strict necessity, or, in their language, 'that an amendment may contain, in addition to the main proposition, such additional provisions as are absolutely necessary to mend any place broken by reason of the adoption of the main proposition, but that the power to mend the broken places would not authorize the reconstruction of such section, or the ingrafting upon it of any provision that should have the effect to do more than cure the ambiguity or inconsistency occasioned by it.' *That the necessity of the incidental change must exist, in order to justify its inclusion with the main proposition, we entertain no doubt.*" (Italics ours.)

Taking into consideration all of the cases cited, it is apparent to us that they agree in substance upon the principle to be used as a test, but differ widely as to the result reached in its application to particular cases. We think that principle, as explained by the cases from which we have quoted, may be restated as follows:

If the different changes contained in the proposed amendment all cover matters necessary to be dealt with in some manner, in order that the Constitution, as amended, shall constitute a consistent and workable whole on the general topic embraced in that part which is amended, and if, logically speaking, they should stand or fall as a whole, then there is but one amendment submitted. But, if any one of the propositions, although not directly contradicting the others, does not refer to such matters, or if it is not such that the voter supporting it would reasonably be expected to support the principle of the others, then there are in reality two or more amendments to be submitted, and the proposed amendment falls within the constitutional prohibition. Nor does the rule as stated unduly hamper the adoption of legitimate amendments to the Constitution. Such a document was presumably adopted deliberately, after careful preparation, as a harmonious and complete system of government. Changes suggested thereto should represent the free and mature judgment of the electors, so submitted that they cannot be constrained to adopt measures of which in reality they disapprove, in order to secure the enactment of others they earnestly desire.

With this clarification of the test laid down in *State* v. *Timme, supra,* let us apply it to the proposed amendment. It is evident that there are at least three distinct propositions contained therein,

no two of which are necessarily required for a proper operation of the third. On their face they have no direct relation *to each other*. Their only connection is that they are all embraced in a broader general subject, to wit, that of taxation. It is clear that the provision in regard to the method in which copper mines should be taxed is in no way necessary to or concerned with the method of taxation of public utility corporations, and it is equally clear that both of those propositions could be inserted in the Constitution without the slightest need of adopting the one establishing the tax commission as a constitutional body which in effect would be independent of the regular executive and legislative branches of the state government in many particulars, and perhaps even of the judicial.

Looking at the proposition as reasonable men, we are of the opinion that the proposed amendment is a most glaring violation of the constitutional provision involved, in that it submits three separate propositions upon which each voter might, and many doubtless would, have widely different opinions, and in such a manner that they are compelled either to reject all three on account of one which they may consider vicious, or else to accept two provisions they disapprove to secure the adoption of one which meets their favor. Such an amendment is log-rolling of the worst type, and violates both the spirit and the letter of the Constitution.

For the foregoing reasons, the judgment of the superior court of Maricopa county is affirmed.

ROSS, C. J., and McALISTER, J., concur.